### WEIDMAN v. PHILLIPS.

1. SALES—FRAUD—INTENT NOT TO PAY PRICE.

   That the purchasers of lumber represented it was a cash deal, but did not pay for the merchandise, and were hopelessly insolvent, that the lumber was immediately turned over to a creditor of the purchaser, at a price lower than cost, and that the purchaser had no reasonable expectation of being able to pay, tends to show a fraudulent intent which gives the seller a right to rescind and recover the property.

2. SAME—FRAUD—RESCISSION—INSTRUCTIONS TO JURY.

   A charge to the jury that to constitute fraud the buyer must have had no reasonable expectation of being able to pay the price within the lifetime of the account, is not error and is unduly favorable to the defendants when coupled with further instructions that an intention not to pay, or to cheat and defraud the owner, must have existed.

3. SAME—TRIAL—INSTRUCTIONS TO JURY—REQUESTS.

   It was not error for the trial court to refuse a request to instruct the jury that the defendants' contention was correct, and that if they, in good faith, intended to continue in business, such intention would legally rebut any inference that they did not intend to pay for the lumber.

4. SAME—MATURITY OF ACCOUNT.

   Under a contract of sale providing that the purchaser should have "two per cent. off within ten days" or "two per cent.

off net bill for cash on arrival of car" the question of the
time when the account matured, was not a question of fact
for the jury.

Error to Saginaw; Gage (Chauncey H.), J.   Submitted
November 19, 1909.   (Docket No. 96.)   Decided December 30, 1909.

Replevin by John S. Weidman against John T. Phillips
and Arthur W. Seeley, copartners as Phillips & Seeley.
A judgment for plaintiff is reviewed by defendants on
writ of error.   Affirmed.

*Davitt & Davitt*, for appellants.

*Beach, O'Keefe & Rockwith* (*Frank McNamara*, of
counsel), for appellee.

HOOKER, J.   The defendants have appealed from a
judgment against them, based on an alleged wrongful
conversion of certain lumber.

The plaintiff owned and operated a sawmill and lumbering
business at Weidman, Isabella county, Mich.   The
Ross Bros., consisting of William and Ronald Ross, were
engaged in a similar business at Beaverton, Gladwin
county.   Defendants are lumber dealers, with offices at
Saginaw.   The plaintiff's claim is based on the following
testimony, which we find it necessary to give somewhat
at length, in order that the case be well understood.   The
plaintiff testified that on the 23d day of October, A. D.
1907, his bookkeeper, one Green, informed him that he
(Green) had had a telephone communication from Ross
Bros., who were at the time dealers in lumber at Beaverton,
Gladwin county, Mich.; that Mr. Green's talk with
Ross Bros. took place about 3:30 p. m., and that about
5:30 o'clock p. m. the plaintiff called up Ross Bros. by
telephone, and talked with William Ross, one of the firm.

"*Q.* Now, the talk between yourself and Ross Bros.—
state what talk you had with him.

"*A.* Well, I called Ross at 5:30, I think, and he asked

me some questions about hemlock—if we had some dry hemlock—and I told him we had. He said he had some nice hemlock orders he could not fill, and he wanted to know if I could fill them. He gave me the different kinds of lumber he wanted, and I told him we could fill them. ' Now,' he says, ' I want spot cash price on this bill stuff, your lowest cash price,' because, he says, ' This is a cash deal.' He said he had been figuring on coming over to see me. He said we had been neighbors for years and doing business pretty close, and never seen each other, and he was often thinking of coming over to see us, but he hadn't time, so he called me up to see if we had this stuff. He said: ' I want you to make this just as close as you can, because it is a spot cash price.' So he gave me the stuff over the telephone, and he said he would confirm that the next day by the order. He sent the order over, and we commenced shipping the lumber out to different points."

Referring to those orders, on cross-examination, plaintiff testified:

"*Q.* What did he say the orders were ?

"*A.* Hemlock boards and bill stuff. Also that bill stuff is lumber; that is, two inches thick. ' Now,' he says, ' I want your spot cash price on this lumber, your best prices on this lumber, for this is spot cash.'

"*Q.* What more was said, if anything ?

"*A.* Nothing more; only it was to be spot cash on arrival of car; to be spot cash.

"*Q.* That was his suggestion ?

"*A.* And I turned around to Mr. Green, and said: ' That is the kind of men we want to deal with; they are cash fellows.'

"*Q.* Well, what was said ? I am asking you to give me a statement, if anything was said in the conversation about bill stuff, in connection with your spot cash price.

"*A.* Why, he gave me a bill. He told me what he wanted. He wanted this bill stuff and boards, but he wanted a spot cash price on both bill stuff and boards; that is, what he shipped him. Also, that this was the only talk he had with Ross Bros. with reference to the sale of this lumber, and it was the first business and the first conversation he ever had with them."

Plaintiff then put in evidence a letter he received from

Ross Bros., which was marked Exhibit M, and reads as follows:

"BEAVERTON, MICHIGAN, 10–23–07.
"Mr. JOHN S. WEIDMAN,
        "Weidman, Michigan.
  "*Dear Sir:*  Please find inclosed confirmation of 6 car loads lumber as per conversation by telephone today. You will please send us the invoices and shipping bills here to Beaverton, and do the best you can as to price less 2 per cent. 10 days from shipment.   Perhaps we will need some more lumber, if so will let you know the first of next week.
        "Thanking you, we are,
                "Yours very truly,
                        "ROSS BROTHERS.
  "P. S.   Kindly acknowledge receipt of these orders and advise about how soon you will be able to ship same, and oblige,
                "Yours truly,
                        "ROSS BROS."

Inclosed with Exhibit M were orders for 6 cars of lumber, two of which were returned unfilled.   The orders that were filled were put in evidence, and numbered Exhibits 4, 5, 6, and 7.   But no part of that lumber came into the hands of the defendants, and recovery against them therefor was not sought.

Plaintiff also put in evidence the following letter to him from Ross Bros., which was marked Exhibit N, and reads as follows:

  "BEAVERTON, MICHIGAN—10—26—07.
  "Mr. JOHN WEIDMAN,
        "Weidman, Mich.
  "*Dear Sir:*   We inclose you herewith three orders for lumber to be shipped rough to Ross Brothers, Saginaw, Mich., which, we hope, you will be able to get out soon; of course Gondola cars are scarce now on account of sugar beets, but these orders can be loaded on flat cars, as they are small loads and are to be shipped only to Saginaw. Please acknowledge receipt of these orders and about how soon you will make shipment, and oblige,
                "Yours very truly,
                        "ROSS BROTHERS.

" P. S. Please send us the shipping bill and invoice as soon as cars are loaded so we can have these cars taken care of as soon as they reach Saginaw."

Plaintiff also gave evidence tending to show that these orders were filled as directed, and put in evidence the shipping bills. Plaintiff also gave evidence tending to show that the lumber described in Exhibits A, B, and C was shipped according to orders, and after its arrival in Saginaw was transferred by Ross Bros. to the defendants, Phillips & Seeley. And, further, that Ross Bros. did not pay the plaintiff any part of the purchase price of said lumber. Neither did the defendants, Phillips & Seeley, pay Ross Bros. any present consideration, but they were given credit on notes that were made and discounted at the bank, which were taken up by Phillips & Seeley, which notes were all made and discounted at the bank prior to the purchasing of the lumber from the plaintiff in this suit. Evidence was given tending to show the value of lumber shipped by the plaintiff on those orders; that that lumber came into the hands of the defendants, and that it was worth the amount specified in Exhibts A, B, and C, to wit, $906.87, and further, that the plaintiff first learned that this lumber came into the hands of the defendants about November 30, 1907.

Plaintiff also gave testimony tending to show that, in addition to the lumber which so came into defendants' hands, Ross Bros. ordered of plaintiff, and he shipped accordingly, at intervals between November 2, and November 16, 1907, inclusive, other lumber, which went into the hands of persons other than defendants, of the value of $2,846.19. That that lumber was shipped according to Ross Bros.' orders, on shipping bills containing the same terms and conditions as Exhibits A, B, and C. The shipping bills of this lumber were marked Exhibits D, E, F, G, H, I, J, and K. When these were offered in evidence, counsel for defendants objected, on the ground that they were not material, which objection was overruled and exception duly taken.

"*Judge Beach:* Why, if the court please, this is lumber that was shipped to Ross Bros. under the arrangement that was had over the telephone. Now, the whole transaction that they had with them with reference to their dealing is perfectly competent here for the purpose of showing the condition that Ross Bros. was in at the time.

"*The Court:* If I understand you right, the telephone conversation related, not only to this particular lot of lumber, but referred to other lots of lumber, too?

"*Judge Beach:* Yes, sir.

"*The Court:* And what you desire to show is that Mr. Weidman fulfilled his part by shipping all of the order to somebody?

"*Judge Beach:* To Ross Bros.; yes.

"*The Court:* And that none was paid for?

"*Judge Beach:* None of it was paid for."

Plaintiff, in company with his attorneys, Frank Dodds and John F. O'Keefe, before commencement of this suit, went to the office of Phillips & Seeley, in the city of Saginaw, and demanded the lumber, and offered to pay the defendants any money that they had paid for freight, and asked him how much money he had paid. Defendant refused to state to him how much he had paid, and said he would not accept it anyway, and when demand was made for the lumber, he then stated that he didn't have it, and wouldn't pay for it unless he was compelled to, and gave his reason because Ross Bros. owed him a great deal of money.

To further maintain the issue on his part, plaintiff offered evidence tending to show that on the 2d of December, 1907, an involuntary petition in bankruptcy was filed in the United States district court for the eastern district of Michigan, northern division, against Ross Bros. as a firm and as individuals; that on December 27th they were adjudicated bankrupts, and a receiver of their property appointed, and that on January 17, 1908, a trustee was appointed, Miles J. Purcell, Esq., of Saginaw, being appointed receiver, and later trustee, and that he as such had taken possession of the property and assets of Ross Bros.

It was also shown that Ross Bros. were deeply in debt to defendants; that the lumber was sent to them to apply on their debt, at the price of $15.50 per M. ft., which was $3 per M ft. less than price charged Ross Bros. by plaintiff. It was plaintiff's claim that the purchase by Ross Bros. was fraudulent, and gave him the right to rescind, which he claims that he did, as hereinbefore stated, as soon as he ascertained that the purchase was fraudulent.

This cause is much like *Skinner* v. *Hoop Co.*, 119 Mich. 467 (78 N. W. 547, 75 Am. St. Rep. 413). There, as here, one alleged to be insolvent bought property, and sold it to others. There, as here, he promised to pay for it at once, and did not. There we held that, under the facts shown, the cause should have gone to the jury to determine whether the purchaser had at the time a preconceived intention not to pay, or no reasonable expectation of being able to do so. In the present cause there was abundant proof of insolvency, and the situation was such that a juror might legitimately find that the purchaser had no reasonable expectation of being able to pay, even if it should be thought that he may have had any such expectation. It follows that the court did not err in refusing to direct a verdict for defendants, if the case must turn on the question of fraud.

Counsel say that "Ross Bros. may be censurable for not knowing that their efforts to pull the business through and prevent an ultimate wreck were hopeless, but such conduct on their part was not fraudulent;" and that, "Concealing their insolvent condition, if they were insolvent and concealed it, was not such fraudulent conduct as would warrant rescinding the sale." This all depends on the circumstances. It cannot be said that a party may continue to try to keep his business going by buying goods on credit to pay overdue obligations with, under any and all circumstances, and not be guilty of fraud, for the expectation of successfully weathering the storm may be such a forlorn hope as to exclude all reasonable expectation, and then such a purchase as this is fraudulent. We

think counsel are wrong in saying that there was no evidence that Ross Bros. did not intend to pay, except their possible inability to pay. The circumstances of their insolvency and its degree of hopelessness, their own knowledge of such circumstances, the immediate transfer of the lumber at a loss, are all circumstances which bear upon the question one way or the other, and it is for the jury to say, viewing the purchase in the light of all of them, whether they did expect to pay, or whether they had no such reasonable expectations.

Error is assigned upon the following charge:

"For the purposes of this case, if a party is insolvent or in failing circumstances—one or the other, or both—at the time he purchases property, and has no reasonable expectation of receiving money from some source that he has a right to receive it from to meet the obligations, and does not intend to pay for it, under such circumstances the buyer would have a right to rescind the contract, and take the property into his own possession and treat the sale as void, although he may have delivered the property to the buyer. Insolvency alone is not sufficient. It is not the law that because a man is insolvent he cannot do business. It sometimes occurs that a man may be insolvent, yet he may be doing business while in a state of insolvency—that is, his assets may be less than his liabilities—and yet he may continue business and continue the struggle to maintain himself and his credit and his business; and from the very fact that he continues with the struggle, and finally he emerges from it successfully, it is not the law that because a man is insolvent he must lie down and do nothing, so that that (insolvency) alone is not sufficient to warrant the seller in rescinding a contract of this character; but this is an important circumstance to be taken into consideration by the jury relative to other facts that are necessary to be found by the jury, before a sale can lawfully be rescinded. Those other facts must be these in addition to insolvency. He must have at the time he makes the order no reasonable expectation of receiving money to pay for the goods so purchased within the lifetime of the account. He must also have no reasonable expectation of receiving it. That additional circumstance must appear; and then in addition to that— that this is the central or main purpose of the law—he

must at that time have in his own mind that intention not to pay for it; in other words, to cheat and defraud the owner of the property."

It is said that this indicated to the jury that they might base fraud upon a finding that the purchaser had no reasonable expectation of being able to pay during the lifetime of the account. But this is not so, for in the next few lines he speaks of what he calls the "central fact," viz., "an intention not to pay," and he adds, "in other words, to cheat and defraud the owner of the property."

It is urged also that the charge was too restrictive, in that it states that a right to rescind would exist if an insolvent had no reasonable expectation of receiving money from some source that he has a right to receive it from, to meet the obligations, *and does not intend to pay for it.* It is said that the implication is that, unless they had a reasonable expectation of getting the money so that they could pay at maturity, there would be a right to rescind, and that this excluded the possible receipt of money from a prospective sale of land regarding which negotiations were pending.

We are of the opinion that there is no such implication as that mentioned, and that the language is broad enough to give the jury to understand that a reasonable expectation of getting money from any source was contemplated. But, further, the learned circuit judge coupled with this want of expectation to receive money the want of intention to pay for it (*i. e.*, the lumber) which, in another place in the same portion of the charge, he calls the "central or main purpose of the law" an intention not to pay— *i. e.*, an "intent to cheat and defraud the owner of the property"—and he couples them again in his recapitulation on page 74 of the record. This was a more favorable instruction than was necessary, as it in each instance coupled an actual intention to cheat with the absence of expectation to be able to pay, while the former would be sufficient ground for rescission without the latter.

Our attention is challenged to several of defendants' re-

quests to charge. Of these we may say that they were in the main covered by the charge, and the judge so told counsel, who thereupon made some suggestions, to which the court acceded. Particular stress is given on an alleged failure to give requests VII and A–8. VII was given in substance, while we think A–8 was properly refused.

Upon this record the court did not err in failing to submit to the jury the time when payment was due.

We have endeavored to make a critical examination of each point raised, and have found no error.

The judgment is affirmed.

BLAIR, C. J., and MOORE, McALVAY, and BROOKE, JJ., concurred.