**KALAMAZOO MANUFACTURING COMPANY, Plaintiff,**

**v.**

**Randall P. ANDERSON; Ran Ventures, Inc.; and Ace Equipment Company, Defendants.**

**No. 87–1677–K.**

United States District Court, D. Kansas.

April 12, 1989.

Ron D. Beal, Klenda, Mitchell, Austerman & Zuercher, Wichita, Kan., for plaintiff.

Dennis M. Feeney and Diane S. Worth of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for defendants.

MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This is a common law fraud action brought by plaintiff Kalamazoo Manufacturing Company ("Kalamazoo"). Kalamazoo claims the defendant Ace Equipment Company ("Ace"), while insolvent, pur-

chased equipment from Kalamazoo with the intent not to pay for the equipment. Plaintiff further asserts that Ace concealed its financial condition from Kalamazoo as well as its intent not to pay, and Kalamazoo relied upon these actions to its detriment.

In addition to Ace, Kalamazoo originally brought this action against Ace shareholders Ran Ventures, Inc. ("Ran Ventures"), R.D. Hubbard and Edward Burger, and against Randall P. Anderson, a shareholder in Ran Ventures. Hubbard and Burger were subsequently dismissed by plaintiff. Kalamazoo maintains that defendant Anderson should be held liable for any damages sustained by Kalamazoo on the theory that Ran Ventures is the alter ego of its shareholder Randall Anderson, and that Ace is, in turn, the alter ego of Ran Ventures. In the alternative, Kalamazoo contends that Anderson may be held personally liable because he actively participated in the fraud. This case is now before the court on the remaining defendants' motion for summary judgment.

The court heard oral argument on defendants' motion on February 6, 1989 and reserved ruling at that time. After reviewing the briefs and extensive supporting documentation filed by the parties, the court is now prepared to rule.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, this court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir.1988). Further, the party moving for summary judgment must demonstrate its entitlement beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim, but rather, must only establish that the factual allegations have no legal significance. *Dayton Hudson Corp.*

*v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

Kalamazoo Manufacturing Company is a Michigan corporation with its principal place of business in Plainwell, Michigan. Kalamazoo manufactures industrial carriers—fixed base platform vehicles with varying weight capacities that haul personnel or equipment through a manufacturing facility.

Until its dissolution in 1985, Ace Equipment Company was a material handling company which purchased industrial vehicles, equipment, materials, and supplies for resale and distribution to its customers. Ace was incorporated in January, 1983, and its original shareholders were Marvin Brown, Robert Arvold, R.D. Hubbard, Edward Burger, and Ran Ventures, Inc. Ran Ventures was owned by Randall Anderson and his wife.

At the time of its incorporation, Ace obtained a line of credit of $150,000.00 from Kansas State Bank and Trust Company ("KSB & T"). The note was secured by all of Ace's accounts receivable, contract rights, inventory, machinery, equipment, furniture and fixtures, and after-acquired property. The note was further secured by the personal guarantees of Hubbard, Burger, Anderson, Brown and Arvold. Brown

and Arvold were subsequently released as guarantors.

Allis–Chalmers was Ace's primary supplier of new trucks and accessory inventory. Under its dealer agreement with Allis–Chalmers, Ace was required to give Allis–Chalmers a security interest in all equipment, inventory, accounts receivable, and proceeds therefrom relating to Allis–Chalmers' equipment and inventory purchased on credit by Ace. Allis–Chalmers also required personal guarantees from the shareholders.

Kalamazoo was another of Ace's suppliers. Near the beginning of the two companies' business relationship, Ace sent Kalamazoo an informational sheet and Ace's balance sheet dated February 28, 1983. From the time of Ace's incorporation in January of 1983, until its dissolution in September of 1985, Ace made more than 50 credit purchases from Kalamazoo. Except for the transaction which is the subject of the instant dispute, each of these purchases was paid in full by Ace.

From January of 1983 until September of 1984, Marvin Brown served as Ace's president and general manager. During that time period, Randy Anderson was not an officer or member of the board of directors of Ace. As a representative of Ran Ventures, however, Anderson received various memos and reports regarding the financial condition of Ace. Prior to September of 1984, Anderson became concerned about the management of Ace because he had not received financial statements since March, 1984, nor any other information regarding Ace's financial condition.

Due to these accounting problems, Donna Clasen was hired as Ace's office manager in September, 1984, and Marvin Brown resigned as Ace's president. Randy Anderson was elected president on September 21, 1984, at a special meeting of the board of directors. In October of 1984, Rod Setchell, who had been a sales manager for Ace, was hired as general manager. Ace's financial statements, prepared in October of 1984, showed that Ace's financial condition had deteriorated. Ace's officers and directors hoped, however, that by hiring an office manager and general manager, the financial condition of the company could be improved. Also in October, 1984, Ace's line of credit with KSB & T was increased from $150,000.00 to $275,000.00.

In March, 1985, C.E. "Bud" Peacock was hired to replace Rod Setchell as general manager. At the time Peacock was hired, Ace shareholders were optimistic about the company's future. Peacock understood that he was hired in order to make Ace a profitable company.

In April, 1985, Ace sought to renew its line of credit with KSB & T, and on April 9, 1985, Ace's notes were rolled over into a $260,000.00 note. At approximately that same time, Anderson advised KSB & T officials that he "wanted to give the company another six months to see if it could be turned around." (Anderson Depo., p. 120.)

Beginning in May, 1985, and continuing throughout the summer of 1985, an attempt was made to turn Ace into a profitable company. For instance, an effort was made to introduce new product lines and dealerships which had potentially greater profit margins. Additional sales personnel were hired and other personnel changes were made. Finally, attempts were made to increase sales in certain areas of potentially high profitability, including sending out new sales flyers and marketing brochures to customers through June, July and August of 1985.

The $260,000.00 note with KSB & T was again renewed in June, 1985. On July 17, 1985, Ace sought to borrow an additional $30,000.00 from KSB & T, $20,000.00 of which was to be used to fund a new product line, and $10,000.00 of which was to be used to fund working capital losses. This loan was eventually approved by KSB & T.

At the heart of this litigation is a transaction which was instigated on April 10, 1985, with the request of Boeing Military Airplane Company ("Boeing") that Ace provide it with 12 Kalamazoo platform trucks. On April 18, 1985, after receiving a quotation from Kalamazoo, Ace submitted its quotation to Boeing. Boeing subsequently submitted its purchase order to Ace, and on June 5, 1985, Ace prepared and submitted a

purchase order to Kalamazoo for 12 platform trucks at a cost to Ace of $165,652.80. The sale by Kalamazoo to Ace was on a 30–day credit basis. Kalamazoo did not take a purchase money security interest in the equipment nor did it request updated financial records from Ace.

Craig Kadel was the sales representative who handled the transaction for Ace. Kadel testified in his deposition that Randy Anderson was aware of the Boeing order because Anderson was in the office the day Kadel brought the order in. Kadel further testified that Anderson congratulated Kadel on obtaining the order. (Kadel Depo., pp. 21–22.) Anderson, on the other hand, testified that although the Boeing order was a "substantial sale for the company," he was never specifically informed of the order. (Anderson Depo., p. 135.) Rather, Anderson believes he was probably "informed of [the sale] in a general fashion" by the company's general manager. (Anderson Depo., p. 135.)

Kalamazoo delivered six of the trucks to Ace between July 31, 1985 and August 6, 1985. As planned, Ace delivered these trucks to Boeing. Ace received payment for the trucks from Boeing in two installments—a partial payment of $30,444.88 on September 10, 1985, and the balance of $57,231.44 on September 17, 1985. Ace deposited the proceeds from the sale of the trucks on the date the second payment was received—September 17, 1985.

Randall Anderson testified in his deposition that on September 15, 1985, two days before the payments from Boeing were deposited, he spoke by phone with Edward Burger, and the decision was made to liquidate Ace.[1] According to Anderson, the decision to liquidate was made because there were insufficient funds to meet the upcoming payroll, the directors were disillusioned with the performance of the general manager, sales orders were low, Ace faced competition from a new company, and the general economic climate looked grim.

On September 16, 1985, Randy Anderson and Donna Clasen met with legal counsel to discuss the best procedure for liquidating Ace. At that meeting, they were advised by counsel not to file bankruptcy or to undertake a formal dissolution under the corporate code, but rather, to "proceed in an expedient manner to liquidate the assets of the company" and to "let the corporate existence die by not filing the annual corporation reports as required." (Anderson Depo., p. 269.)

The liquidation process was begun on September 17, 1985—the same date the proceeds from the sale of the trucks to Boeing were deposited in Ace's checking account. On that date, Anderson directed the payment of $115,000.00 to KSB & T to be applied against the principal indebtedness of $290,000.00. The proceeds from the subsequent liquidation of Ace's assets were used to pay KSB & T in full and to pay all but $6,000.00 of the secured debt to Allis–Chalmers. Other liabilities paid by Ace included accrued FICA taxes and federal and state withholding taxes. No funds remained, however, to pay unsecured creditors, including Kalamazoo.

While the liquidation was completed in December, 1985, the facts are in dispute as to when Kalamazoo officials became aware of the liquidation, and at what point they realized Kalamazoo would not be paid. Donna Clasen testified in her deposition that she had a phone conversation with Blake Hawk, Kalamazoo's vice president, on September 19, 1985, and with Pete Hawk, Kalamazoo's president, on September 20, 1985. She does not recall whether she told either of the Hawks that Ace was liquidating. Clasen's notes of the conversations indicate that the Hawks questioned her about when Kalamazoo would be paid for the trucks, and she responded that she was unable to disburse or release funds at that time. Her notes also show that Pete Hawk stated that Kalamazoo would not ship the remaining six trucks until it was

1. Anderson and Burger were elected as directors of the corporation at the annual stock-holders meeting on May 31, 1985.

paid for the first six,[2] and he further "indicated [Kalamazoo] would take legal action." (Defs.' App. 24, pp. 3–4.)

Kalamazoo contends it was not advised by Clasen of Ace's liquidation or that the sales proceeds from the trucks sold by Kalamazoo to Ace had been applied to the secured debts of KSB & T and Allis–Chalmers. In October, 1985, Kalamazoo instituted suit against Ace for recovery of monies due in connection with the sale of the trucks. Judgment was entered December 13, 1985, and execution on the judgment was issued December 24, 1985. Kalamazoo contends it was not until January of 1986, when it was permitted to inspect the corporate records of Ace in connection with the judgment, that it learned of the liquidation and the use of the proceeds from the sale of the Kalamazoo trucks to pay off debts to secured creditors.

Kalamazoo instituted the instant action for fraud on December 1, 1987. Kalamazoo alleges that at the time the order for the 12 platform trucks was made, Ace was insolvent and the defendants had formed the intent not to pay for the equipment, but instead, intended to use the proceeds resulting from the sale of the trucks to pay off secured debts which the shareholders had personally guaranteed. Plaintiff claims defendants intentionally concealed these facts from Kalamazoo and Kalamazoo relied on defendants' actions to its detriment. Further, plaintiff asserts that defendant Anderson should be held personally liable for any damages sustained by Kalamazoo on the theory that Ace's shareholder, Ran Ventures, is the alter ego of its shareholder Randy Anderson, and that Ace is, in turn, the alter ego of Ran Ventures. Alternatively, Kalamazoo argues Anderson may be held personally liable because he actively participated in the fraud.

In this motion, defendants contend no genuine issues of material fact exist and that they are entitled to judgment as a matter of law. They argue that plaintiff cannot prove the elements necessary to establish fraud—namely, intent and reliance. Defendants claim intent to defraud cannot be proven because at the time Ace ordered the trucks from Kalamazoo, and at the time Kalamazoo delivered the trucks, Ace had a good faith intent to pay for the trucks. Defendants further argue reliance upon the alleged fraud cannot be shown because Ace did not make any affirmative representation to Kalamazoo regarding Ace's financial condition, and Kalamazoo made no inquiries. Moreover, defendants contend Ace had no obligation to inform Kalamazoo of its financial condition. Finally, defendants argue the facts are undisputed that Randy Anderson did not participate in the Kalamazoo transaction and therefore cannot be held personally liable for any damages sustained by Kalamazoo.

## Conclusions of Law

### Choice of Law

■ Initially, the court must determine whether the substantive law of Kansas or Michigan applies to plaintiff's fraud claim. Plaintiff contends the substantive law of Michigan applies, while defendants suggest the court should apply Kansas law.

Both parties correctly note that this court, as a federal court sitting in diversity, must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Missouri Pacific Railroad Co. v. Kansas Gas & Electric Co.*, 862 F.2d 796, 798 n. 1 (10th Cir.1988). In tort actions, Kansas follows the *lex loci delicti* approach of the First Restatement, which means the law of the "place of the wrong" controls. *Brown v. Kleen Kut Mfg. Co.*, 238 Kan. 642, 644, 714 P.2d 942 (1986); *Ling v. Jan's Liquors*, 237 Kan. 629, 634, 703 P.2d 731 (1985). The "place of the wrong" is that place where the last event necessary to impose liability took place. *Id.*, at 634–35, 703 P.2d 731. Thus, in most tort cases, the place of the

---

**2.** Kalamazoo subsequently delivered the remaining six trucks directly to Boeing, after refusing to ship them COD to Ace.

wrong is the place where the injury occurred. *Id.*

While the Kansas Supreme Court has not addressed the question of where the place of the wrong is in a fraudulent misrepresentation case, this court recently observed in *Raymark Industries, Inc. v. Stemple, et al.*, No. 88–1014–K, slip op. at 10 (D.Kan. Aug. 10, 1988), that in fraud cases " 'the place of wrong is where the loss is sustained, *not* where fraudulent representations are made.' " (quoting FIRST RE-STATEMENT OF CONFLICTS § 377 n. 4.) (emphasis added).

Plaintiff asserts that the First Restatement of Conflicts, which this court adopted in *Raymark*, requires application of Michigan law in this case. As proof, plaintiff refers the court to Illustration No. 5 in the Restatement, which provides as follows:

> (5) A, in state X, makes false representations by letter to B in Y as a result of which B sends certain chattels from Y to A, in X. A keeps the chattels. The place of the wrong is in state Y where B parted with the chattels.

FIRST RESTATEMENT OF CONFLICTS § 377 n. 4, Illus. No. 5.

Utilizing this analysis in the instant case, the court concludes the "place of the wrong" is in Michigan, where Kalamazoo parted with the trucks and sustained a loss as a result of the alleged fraud on the part of defendants.

The application of Michigan law in this case is not, as defendants contend, inconsistent with this court's holding in *Raymark*. There, Raymark alleged the named defendants had defrauded Raymark in connection with a class action settlement administered by this court. When faced with the question of whether Kansas law controlled plaintiff's claim, this court found that the loss to Raymark was sustained in Kansas because the settlement took place in Kansas and monies were thus paid out by Raymark in Kansas. In this, the court found that if Raymark's allegations were true, there had been a "fraud upon this court, as well as upon Raymark." Slip op. at 10. Thus, in *Raymark*, the court applied Kansas law based upon its finding

that plaintiff's loss was sustained in Kansas, where the plaintiff "paid out" monies and where the allegedly fraudulent representations were received. Similarly, in this case, the court finds that the loss was sustained in Michigan, where the plaintiff "parted with" the trucks and where any alleged misrepresentations were received.

It is also significant that this court in *Raymark* cited with approval Judge Saffels' opinion in *Seitter v. Schoenfeld*, 678 F.Supp. 831 (D.Kan.1988). In *Seitter*, Judge Saffels held that Illinois law was applicable to the negligent misrepresentation claim of an Illinois creditor against a Kansas debtor. The court reasoned that although the debtor's foreclosed-upon assets were located in Kansas, the creditor suffered injury in Illinois, where "the effects" of the debtor's allegedly fraudulent actions were felt. 678 F.Supp. at 836. In the instant case, the "effects" of the alleged misrepresentations were felt in Michigan, where Kalamazoo is located. Accordingly, the court finds Michigan law applicable to plaintiff's fraud claim.

*Fraud Claim*

█] Defendants next argue summary judgment is appropriate because the undisputed facts do not support Kalamazoo's fraud claim. Specifically, defendants contend Kalamazoo has alleged no facts to support the fraud elements of intent and reliance.

In order to establish a claim of common law fraud or misrepresentation under Michigan law, plaintiff must prove: (1) that defendant made a material representation that was false; (2) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (3) that he made it with the intention that it should be acted upon by plaintiff; (4) that plaintiff acted in reliance upon it; and (5) that he thereby suffered injury for which he sues. *Eaton Corp. v. Easton Assoc., Inc.*, 728 F.2d 285, 292 (6th Cir.1984); *Hi–Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813 (1976).

One manner of perpetrating a fraud is by purchasing goods with a preconceived intent not to pay for them. The fraud, in such a case, is in the buyer's express or implied false representation of his intent to pay or in the concealment of his intention not to pay. *See generally* 37 Am.Jur.2d, *Fraud & Deceit* § 34.

In the instant case, plaintiff does not assert that any agent of Ace made any affirmative representation to Kalamazoo regarding Ace's solvency or its ability to pay. Rather, plaintiff argues that defendants had a preconceived intent, plan or scheme to purchase the trucks on credit with no intent to pay for them. Further, plaintiff asserts that defendants concealed this plan and the fact of Ace's insolvency from Kalamazoo.

In their motion for summary judgment, defendants argue that the facts do not support plaintiff's contentions, but rather, indicate that at the time the trucks were purchased,[3] defendants intended to pay for the trucks.

In Michigan, the elements of a commercial fraud case are (1) the purchaser must have been insolvent or in failing circumstances; (2) the purchaser must have had a preconceived intention not to pay for the goods, or no reasonable expectation of being able to do so; and (3) the purchaser intentionally concealed these facts, or made a fraudulent representation in reference to them. *Elbro Knitting Mills v. Schwartz*, 30 F.2d 10, 12 (6th Cir.1929) (applying Michigan law); *Weidman v. Phillips*, 159 Mich. 380, 124 N.W. 40, 42 (1909); *Skinner v. Michigan Hoop Co.*, 119 Mich. 467, 78 N.W. 547, 549 (1899).

Defendants argue that more recent Michigan cases require plaintiff to show that defendant had a preconceived intent not to pay for the goods, but do not permit an inference of intent where the buyer had "no reasonable expectation" of being able to pay. *See, e.g., Carson v. Milcrow Motor Sales*, 303 Mich. 86, 5 N.W.2d 665, 666 (1942). The court does not agree. The elements of fraudulent misrepresentation, as set forth at page 14 of this order, permit a finding of intent to defraud where the defendant makes a false representation recklessly, without any knowledge of its truth. In a commercial fraud case, this element corresponds with a showing that the buyer had no reasonable expectation of paying for the goods.

In any event, the court agrees with defendants that the facts do not support plaintiff's claim that at the time of the purchase defendants had a preconceived intent not to pay or had no reasonable expectation of paying for the goods. Rather, the facts indicate that up until September of 1985, the principals of Ace intended that Ace would continue in business, and intended that Kalamazoo would receive payment for its trucks.

Although Ace's financial condition was poor, it never failed to pay any of its creditors at any time during its existence until it liquidated. Moreover, it is uncontroverted that throughout the spring and summer of 1985, efforts were made to turn the company into a profitable enterprise. In April, 1985, Anderson informed KSB & T that he wanted to give Ace at least another six months to become profitable. Ace followed up by hiring Bud Peacock as general manager, introducing new product lines, adding sales personnel, and attempting to increase sales through new marketing techniques. As late as July of 1985, Ace renewed its note with KSB & T and borrowed an additional $30,000.00 to be used to fund a new product line and working capital losses. Finally, when Ace did decide to liquidate, it

---

**3.** The parties disagree regarding the point at which "the time of purchase" occurs. Plaintiff argues the relevant time for determining whether defendants formed an intent not to pay for the goods is when the seller delivers the goods and the goods are accepted by the buyer. Defendants assert that the relevant time is when the purchase order is made. Defendants agree, however, that the "purchase" is complete, at the very latest, when the seller delivers the goods to the buyer. Therefore, in determining whether there is any evidence that defendants intended to defraud the plaintiff, the court will consider the relevant time period to be from the date of the purchase order (June 5, 1985) to the date the trucks were delivered (July 31, 1985 through August 6, 1985).

proceeded only upon the advice of legal counsel.

These actions are entirely consistent with defendants' contention that they intended to continue operating Ace and contrary to plaintiff's assertion that defendants had formed a preconceived intent not to pay Kalamazoo, but rather, to utilize the proceeds from the sale of Kalamazoo's trucks to liquidate the company.

Plaintiff attempts to argue that because of Ace's poor financial condition, defendants could have no reasonable expectation of paying for the goods. Plaintiff argues it is significant that KSB & T renewed Ace's line of credit and loaned additional funds to Ace only because its shareholders personally guaranteed the loans. Plaintiff ignores, however, the uncontroverted fact that despite its poor financial condition, Ace consistently paid its creditors until the time of liquidation, and the evidence indicates it had every expectation of paying Kalamazoo. Moreover, it is not fraud per se for a dealer to purchase goods while insolvent, even if the purchaser knows he is insolvent and fails to disclose such facts to the seller. Rather, there must be some indication that the buyer purchased the goods with the intention not to pay for them. *See Carson v. Milcrow Motor Sales*, 5 N.W.2d at 666; *Elbro Knitting Mills v. Schwartz*, 30 F.2d at 11.

Plaintiff concedes that none of Ace's employees involved in the Kalamazoo transaction had any knowledge of Ace's financial condition, or had formed an intent not to pay Kalamazoo. Nevertheless, Kalamazoo contends that the company's president, Randy Anderson, did know of the transaction and intended to utilize the proceeds therefrom to pay off secured creditors. Plaintiff reasons that evidence of such a scheme can be inferred from Anderson's subsequent utilization of the proceeds from the liquidation of the company to first pay off secured creditors and other debts for which he and Ace's other shareholders would have been personally liable.

Plaintiff's "inferences" are not supported by the record. The uncontroverted evidence indicates the decision to liquidate was not made until September 15, 1985. Moreover, the liquidation was conducted pursuant to the advice of legal counsel. Plaintiff fails to explain how the fact that obligations for which the shareholders were personally liable were paid first has any relation to defendants' intent "at the time of the purchase" not to pay for the trucks. Further, while the question of whether Anderson was aware of the specific nature of the Kalamazoo transaction is controverted, the court does not find this fact to be material. Assuming that Anderson was aware of the transaction, the court is still unable to relate Anderson's mere knowledge of the transaction to his subsequent actions in liquidating the company.

It is uncontroverted that Kalamazoo was one of Ace's several unsecured creditors and that upon liquidation Ace paid its secured creditors first. It is also not controverted that upon liquidation Ace paid other obligations for which the shareholders would have been personally liable, and that Kalamazoo and other creditors went unpaid. Nevertheless, it is not fraud per se for a purchaser not to pay for goods. Nor does the fact of a subsequent failure of the purchaser's business make the purchase fraudulent by relation. *Elbro Knitting Mills v. Schwartz*, 30 F.2d at 11–12.

Accordingly, the court finds that the facts do not establish that at the "time of purchase," the defendants had a preconceived intent not to pay Kalamazoo for the trucks or that defendants had no reasonable expectation of paying for the trucks.

■ Even if there were some evidence to indicate that defendants did not intend to pay Kalamazoo for the trucks, the facts do not support a finding that Ace intentionally suppressed or concealed any facts which it had a duty to reveal to Ace. Kalamazoo has cited the court to no authority indicating that Ace had any obligation to disclose its insolvency or failing financial condition to Ace.

Kalamazoo relies on *Wolf v. Brungardt*, 215 Kan. 272, 282, 524 P.2d 726 (1974), for the proposition that defendants were under a legal obligation to inform Kalamazoo of

the specifics of Ace's financial condition. The court finds, however, that *Wolf* is distinguishable in two respects. First, the court in *Wolf* found a fiduciary relationship existed between the parties to the contract. Second, the court found a duty to disclose existed where one of the parties to the contract had knowledge "not within the fair and reasonable reach of the other party and which [the other party] could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, ..."

In this case, the parties were clearly not in a fiduciary relationship, nor did defendants have access to any information not within the reach of plaintiff. Rather, it is uncontroverted that plaintiff could have protected itself by making inquiry into Ace's financial condition or by taking a purchase money security interest in the equipment.

Thus, in the absence of a fiduciary relationship, or any evidence that defendants concealed information from plaintiff which was unavailable to plaintiff, the court finds that plaintiff cannot establish that defendants concealed information from plaintiff which they had a duty to reveal.

Because the court finds that plaintiff has failed to establish the facts necessary to support its claim of fraud, any remaining issues are moot and summary judgment for defendants is proper.

IT IS ACCORDINGLY ORDERED this 11 day of April, 1989, that defendants' motion for summary judgment is granted.